IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JONATHAN LEE OLIVER,<br><br>Defendant. | CR 13–34–M–DWM<br><br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW |

This matter came before the Court on a petition to revoke the supervised release of the defendant, Jonathan Lee Oliver. The Court held a hearing on May 11, 2021. Witnesses were sworn and testified, and certain exhibits were offered and received into evidence. From the evidence presented, the Court makes the following ruling pursuant to Federal Rule of Criminal Procedure 32.1 after having previously revoked Oliver's supervised release.

Jonathan Lee Oliver's background is reflected in the Amended Petition to Revoke Supervised release and provides context for the multiple efforts previously engaged in by United States Probation Officer David Velasquez and Supervising Probation Officer Derek Hart to not only advise Oliver of his obligations under the conditions of his supervised release, but to correct what Oliver suggested were only misunderstandings. The Amended Petition sets forth in detail the litany of the

1

supervisory efforts of Officer Velasquez and others in the probation office. Oliver's underlying criminal conviction was for wire fraud, money laundering, and structuring. (Doc. 40.) He was sentenced to 100 months in federal custody followed by 3 years of supervised release. The amount of funds that Oliver pilfered in connection to his underlying conviction exceeded seven million dollars. This background is relevant because Oliver's breach of trust as set forth below magnifies the conduct of his underlying conviction.

I. **Findings of Fact**

1. The Court presided over a final revocation hearing on May 11, 2021.

2. The plaintiff, the United States, was represented by Timothy J. Racicot, Assistant United States Attorney.

3. The defendant, Jonathan Lee Oliver, was represented by Federal Defender John Rhodes.

4. Prior to his arrest, Oliver resided in Missoula, Montana.

5. The United States Probation Office, specifically Officer David Velasquez, filed an amended petition for warrant for offender under supervision on April 30, 2021, alleging Oliver violated seven conditions of his supervised release. (Doc. 105.)

6. During the revocation hearing on May 11, 2021, the government presented the testimony of two witnesses, Officer Velasquez and Kirkland Conner. The

government also introduced 26 exhibits.

7. At the conclusion of the May 11 hearing, Oliver was found in violation of his conditions and his supervised release was revoked. He was remanded to the custody of the United States Marshal pending sentencing on the revocation of his supervised release.

8. Prior to imposition of a new custodial term, the parties were directed to address the potential implications, if any, of *United States v. Haymond*, 139 S. Ct. 2369 (2019), and *United States v. Horvath*, 492 F.3d 1075 (9th Cir. 2007), on alleged Violation 7.

9. The parties submitted their respective briefs on the question on May 14, 2021. (Docs. 109, 110, 111.)

10. The final dispositional hearing was set for May 18, 2021, at 1:30 p.m.

## II.  Conclusions of Law

11. The following conclusions are based upon the testimony of Officer Velasquez and Kirkland Conner, the 26 exhibits admitted during the May 11 hearing, and consideration of relevant authority.

12. <u>Violation 1</u>: Oliver violated Standard Condition 1, which prohibits him from knowingly leaving the District of Montana without prior approval from his supervising probation officer. On or about March 29, 2021, Oliver traveled from Montana to Kennewick, Washington, without first obtaining permission from

3

Officer Velasquez.

13. <u>Violations 2 and 3</u>: Oliver violated Special Condition 3, which requires him to provide the probation office with any requested financial information and prohibits him from incurring any new lines of credit without prior written approval from the probation office. Oliver failed to provide the probation office with complete financial information on the monthly cash flow statement he submitted on March 25, 2021, which was admitted as Exhibit 1 at the May 11 hearing. Oliver admitted to Officer Velasquez that the form was incomplete and admitted he forgot to include certain information.

14. Specifically, relating to Violation 3, Oliver failed to disclose the following: his purchase of a snowmobile; his down payments to and refund from AMVIC related to the insulation business; his receipt of checks from individuals and entities, also related to the insulation business; the rental of vehicles from Enterprise, Inc.; the expenses he incurred renting storage units in Columbia Falls, Missoula, and Lolo; his ownership of and interest in one or more PayPal accounts; a Brex Mastercard; an E-Trade investment account; two Green Dot Visa cards; a MetaBank Visa card; a Venmo Mastercard; a First Premier bank account; a Bank of America account; a First Progress bank account; and numerous financial transactions (expenditures and receipts) totaling several thousand dollars. (*See* Doc. 107 (Ex. 2–18).)

15. These items were seized by the probation office, were the subject of discussion with counsel at the May 18, 2021 revocation hearing, and were identified in the amended petition for revocation. (*See* Doc. 105 at 3.)

16. <u>Violation 4</u>: Oliver violated Special Condition 4, which prohibits him from forming any limited liability company without prior written approval from the probation office. Kirkland Conner testified that he was involved in some legal aspects of forming Mountain West Material Supply, LLC, Get Permanent Plates, LLC, and other entities associated with Get Permanent Plates, including (possibly) Daley & Wanzer, LLC at Oliver's behest. However, Conner's testimony made clear that he had little actual control over the businesses, and it was Oliver who came up with the business plan and was pulling the strings behind the scenes. Additionally, Conner expressed surprise at the May 11 hearing when confronted with the articles of incorporation for Daley & Wanzer, LLC, (Doc. 107 (Ex. 38 at 2)), on which he was listed as the registered agent and his residence was used as the physical address for the business. Conner's visible reaction on the witness stand casts doubt even on whether he filed the foundational paperwork for that entity.

17. As it further relates to Violation 4, Conner indicated that he had very little, if any, control over the businesses and when asked to elaborate on the situation to the Court, he remarked along the lines of:

5

> I guess mostly I was just extremely frustrated with working with him. Every time that he said or did anything or made any promise, I found out that he was lying, and I just didn't trust anything that he said. So everything that had to do with this business, *since he started it* and he was doing a lot of the footwork on it, I just kind of wanted to roll back. I just wanted nothing to do with it.
>
> And that's why, when you ask me a lot of the details, honestly I was kind of mentally blocking out as much as I could. I just didn't want to invest any time or energy into this, especially since my normal job, my 9 to 5, is extremely stressful, extremely demanding, and I just didn't have much mental energy to put towards this, especially when, the way I saw it, I was just constantly being taken advantage of. And I just wanted to be done.

18. Moreover, Oliver never disclosed to Officer Velasquez his involvement in the LLCs, the income he was generating and the expenses he was incurring, or the fact that he was applying for tax exemptions and vehicle titles as an agent of the businesses. (*See* Doc. 107 (Ex. 19–25).) Therefore, despite that Conner apparently filed the formation paperwork for at least a few of the entities with the Secretary of State, Oliver was, in all practical aspects, the co-owner and principal operator of the businesses. He did not obtain advance written approval from Officer Velasquez to engage in any of these endeavors.

19. <u>Violation 5</u>: Oliver violated Special Condition 6, which requires Oliver to obtain advance written approval from the probation office for all employment. As outlined above, Oliver controlled nearly every aspect of Mountain West Material Supply and Get Permanent Plates, and he failed to disclose their existence to Officer Velasquez, let alone obtain his written approval in advance of employment

with any of the identified entities.

20. <u>Violation 6</u>: Oliver violated Special Condition 12, which requires Oliver to pay restitution at a rate of $1,000 per month or as otherwise directed by the probation office. Even if Oliver had an informal agreement with the probation office to pay $100 a month until he could pay the full amount of $1,000 a month pursuant to the Court's order, that accommodation was based on Oliver's misrepresentations of his financial condition.[1] Oliver has paid only $600 of restitution since his term of supervision commenced. He owes $5,394,298. (Docs. 50, 51.) Based on his unauthorized financial activities, Oliver accumulated—and spent—several thousand dollars that could or should have been applied in part to his restitution obligation. Oliver should have disclosed the money he was spending on storage units, a snowmobile, and other items so that Officer Velasquez could have considered his financial situation and directed him to make current or additional restitution payments.

21. <u>Violation 7</u>: Oliver submitted a monthly supervision report on March 25, 2021, as directed by Officer Velasquez. The report was admitted at the May 11 hearing as Exhibit 26. The report states the following warning on its face: "Any false statements may result in revocation of probation, supervised release, or

---

[1] The alleged agreement between Oliver and the probation office is not in the record, notwithstanding Oliver's reference to such an agreement in his suggested findings of fact and conclusions of law. (Doc. 110 at ¶ 10(c).)

7

parole, in addition to 5 years imprisonment, a $250,000 fine, or both. (18 U.S.C. § 1001)." Contrary to Oliver's arguments, he violated Mandatory Condition 2 and, furthermore, he was given written notice that misrepresentations or prevarications amounting to false statements were sanctionable as criminal offenses.

    a. To satisfy the elements of 18 U.S.C. § 1001, the government must show:

        i. The defendant used a writing containing a false statement;

        ii. The writing was made in a matter within the jurisdiction of the United States Probation Office;

        iii. The defendant acted willfully, or deliberately and with knowledge both that the statement was untrue and the conduct was unlawful; and

        iv. The writing was material to the activities or decisions of the Probation Office; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities.

Ninth Circuit Pattern Jury instruction § 8.73.

    b. The government has proven the elements of 18 U.S.C. § 1001 by a preponderance of the evidence. Even if the standard applied was clear and convincing, the government's proof met that standard. *United States v. Horvath*,

492 F.3d 1075 (9th Cir. 2007), does not protect—nor does it immunize—Oliver's false statements.

    c. In *Horvath*, the Ninth Circuit held that a defendant's false statements during the preparation of the presentence investigation report ("PSR") were within the purview of 18 U.S.C. § 1001(b), meaning that defendant could not be convicted of violating § 1001 if the statement was "to a judge or magistrate." Section 1001(b) states that "[s]ubsection (a) does not apply to a party to a judicial proceeding, or that party's counsel, for statements, representations, writings or documents submitted by such party or counsel to a judge or magistrate in that proceeding."

    d. The *Horvath* Court, in a very narrow opinion, expressly limited its holding to statements made during the PSR stage: "We hold that when, but only when, the probation officer is required by law to include such a statement in the PSR and to submit the PSR to the judge, the statement falls within the exception in § 1001(b)." 492 F.3d at 1076. The Court emphasized, "We pause to make explicit the limited reach of our holding. A defendant's statement to a probation officer is protected under § 1001(b) *only if* the law requires the probation officer to include the statement in the PSR and submit the PSR to the court." *Id.* at 1081 (emphasis added). Those limitations on the Court's holding, on their face, set apart Oliver's misrepresentations and prevarications amounting to false statements. The false

statements on the monthly reports do not implicate the preparation or submission of a PSR, and in most circumstances such monthly finance reports will never be submitted to the judge. Indeed, the probation officer is required to document a defendant's *violation* of a condition of supervised release, but he is not required to transmit a lie or a false statement to the Judge.

 e. The question here is whether the reasoning of *Horvath* is constrained by the plain language of the opinion, or whether it extends to a probation officer's obligation to document violations of the conditions of supervised release and report such violations to the judge, particularly where they might impact restitution. The statutory obligations of the probation officer concerning restitution do not alter the disposition of Oliver's false statements. The holding in *Horvath* means what it says: a defendant's statements to a probation officer are only protected under § 1001(b) in the narrow circumstance where the defendant makes a statement to the probation officer in preparation of the PSR. The *Horvath* Court explicitly limited its holding to this scenario. Therefore, because Oliver's false statements on the monthly report were not required to be included in a PSR, they are not protected under § 1001(b).

 f. The history of the judicial function exception supports this conclusion. The "judicial function exception" of § 1001(b) "developed out of a concern that the statute might be interpreted to criminalize conduct that fell well within the bounds

10

of responsible advocacy." *United States v. Manning*, 526 F.3d 611, 615 (10th Cir. 2008) (internal quotations omitted). The exception was designed to safeguard vigorous advocacy in an adversarial setting by "exempting from section 1001 only those communications made to the court when it is acting in its adjudicative or judicial capacity, and leaving subject to section 1001 only those representations made to the court when it is functioning in its administrative capacity." *Id.* at 617. The representation at issue here was not made "to the Court or Judge." Rather, the statement was made on monthly report, which specifically provided notice to Oliver that false or misleading statements could result in revocation of his supervised release and cited to § 1001. (*See* Doc. 107 (Ex. 26).) It would be absurd if the judicial function exception applied to this form document and the circumstances in this case, rendering the statute toothless and immunizing the purported false statements it was enacted to criminalize.

  g. Furthermore, contrary to Oliver's position, pretrial PSR supervision and preparation is distinct from post-trial supervision and reporting for either someone on probation or supervised release. *United States v. Vreeland*, 684 F.3d 653 (6th Cir. 2012) is helpful in fleshing out this distinction. In *Vreeland*, the defendant made a false statement to the probation officer while on supervised release and decidedly *not* in the context of preparing the PSR. Noting the import of the distinction, the *Vreeland* Court stated, "the probation officer's function as

11

more than merely a 'conduit' to the trial court [is] particularly apropos here, where a probation officer is overseeing a defendant's compliance with the terms of supervised release." *Id.* at 664. Like the probation officer in *Vreeland*, Officer Velasquez was not acting as a mere "conduit." He was trying to oversee and supervise Oliver's compliance with the terms of his supervised release, and his obligation was to report Oliver's violations; it was not, as is the case in PSR writing according to *Horvath*, to convey Oliver's statements directly to the Court. Oliver's statements do not fall within the judicial function exception of § 1001(b).

22. Because Oliver more than likely violated 18 U.S.C. § 1001 and Mandatory Condition 2 set forth at Violation 7, the Chapter 7 advisory guideline range is 18 to 24 months, based on the Grade B violation and Oliver's criminal history category of V. USSG §§7B1.1(a)(2), 7B1.4(a). In the absence of a finding that Oliver violated Mandatory Condition 2 by committing a new law violation, the advisory guideline range would be 7 to 13 months. Contrary to Oliver's arguments at the May 11 hearing, the increased guideline range as a result of Violation 7 is not a violation of his rights under the Fifth and Sixth Amendments.

a. Oliver invokes *United States v. Haymond*, 139 S. Ct. 2369 (2019) (plurality opinion) for his argument that the Court is constitutionally precluded from engaging in fact-finding in a revocation proceeding that could result in an increased advisory Guideline range, but *Haymond* has no application here.

b. In *Haymond*, the Supreme Court held that 18 U.S.C. § 3583(k), which imposed a mandatory minimum five-year sentence based on judicial fact-finding in sex offender cases, violated the Fifth and Sixth Amendments based on *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and *Alleyne v. United States*, 570 U.S. 99 (2013). *Haymond*, 139 S. Ct. at 2373. The Court specifically noted that the "unusual provision[s]" of § 3583(k) raised an *Alleyne* problem at the revocation juncture because the statute imposed a 5-year mandatory minimum term of imprisonment, which amounted to a punishment based on facts not found by a jury. *Haymond*, 139 S. Ct. at 2383. Those concerns are not present here. Oliver is not facing a mandatory minimum term of imprisonment, nor is he facing a longer statutory maximum term based on Violation 7. He is not being punished for his defalcations. Instead, he is facing the potential application of an increased *advisory* Guideline range because of his conduct and its consequences leading to that increased Guideline range. As stated, *Haymond* has no application here.

c. Based on these conclusions related to § 1001, Oliver violated his conditions of release as articulated above and the Chapter 7 advisory Guideline range for those violations is 18 to 24 months.

23. Based on the foregoing, the Court imposed a high-end Guideline sentence on revocation of 24 months as to Count 1, 2 months as to Count 97, and 2 months as to Count 105, to run concurrently. This term of imprisonment shall be followed

by a 12-month term of supervised release on Count 1 and 32 months of supervised release on Counts 97 and 105. The sentence imposed is for the significant and continual violation of the Court's trust. Furthermore, punishment is not an issue as set forth in *United States v. Miqbel*, 444 F.3d 1173, 1182 (9th Cir. 1993). The justification of a high end Guideline sentence is based on my finding that Jonathan Lee Oliver's continuation of dishonesty reflects that he is a danger to the community by virtue of his inability to be candid and truthful in his entrepreneurial and business ideas, relationships, and behavior. He is likely to continue the dishonest pattern of behavior that resulted in his original conviction and this behavior once again brings him before the Court, and also serves as a reason for a high-end Guideline sentence.

DATED this 18th day of May, 2021.

Donald W. Molloy, District Judge
United States District Court